# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

VANDERBILT UNIVERSITY,
FOR VANDERBILT UNIVERSITY
HEALTH BENEFIT PLAN,

    *Plaintiff,*

v.

KATHY PESAK and Husband,
ROBERT PESAK, and LARRY D.
ASHWORTH, Attorney at Law,
as a Nominal Stakeholder,

    *Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 3:08-cv-1132
**Judge Nixon**
**Magistrate Judge Brown**

**JURY DEMAND**

## ORDER

Pending before the Court is Defendants/Counter-Plaintiffs Kathy Pesak and Robert Pesak (the "Pesaks") and Larry Ashworth's Motion for Summary Judgment (Doc. No. 51) and Memorandum in Support (Doc. No. 51-1), as well as Plaintiff/Counter-Defendant Vanderbilt University's ("Vanderbilt") Motion for Summary Judgment (Doc. No. 52) and Memorandum in Support (Doc. No. 57). Both parties filed Responses to each others' Motions. (Doc. Nos. 58 & 60.) Vanderbilt filed a Reply to the Pesaks' Response. (Doc. No. 62.)

For the reasons stated below, the Pesaks' Motion is **DENIED**. Vanderbilt's Motion is **GRANTED in part** as to the Pesaks' counterclaims for abuse of process, intentional infliction of emotional distress, fraud, unjust enrichment and violations of the Tennessee Consumer Protection Act, and **DENIED in part** as to Vanderbilt's restitution claim. Accordingly, the case will proceed only on Vanderbilt's restitution claim.

1

## I.  BACKGROUND[1]

Prior to 2006, Kathy Pesak had been an employee of the Vanderbilt University Medical Center ("VUMC") for twenty-two years, during which time she received medical insurance coverage through Vanderbilt. Vanderbilt, the Plan Fiduciary, Plan Sponsor, and Plan Administrator of the Vanderbilt University Health Plan (the "Plan"), asserts, and the Pesaks do not dispute, that the Plan was covered by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001, *et seq.* BlueCross BlueShield of Tennessee ("BCBS") administered the coverage throughout Mrs. Pesak's employment at VUMC. Every year, Vanderbilt briefed its employees regarding medical insurance options in a process known as Open Enrollment. Vanderbilt provided employees with an Open Enrollment packet, which included an enrollment form, and instructed them on how to complete the enrollment form in order to select coverage for the upcoming year. In October of 2005, although she does not specifically recall receiving an Open Enrollment packet, Mrs. Pesak signed, dated, and returned her enrollment form for 2006 to Vanderbilt. She admits that throughout her twenty-two years at Vanderbilt, she accepted the medical coverage provided by Vanderbilt, and that her coverage as advised did not differ from the coverage she received.

On February 13, 2006, Mrs. Pesak was injured in a car accident. Vanderbilt asserts, and the Pesaks neither admit nor deny (and put forth no contrary evidence), that the medical expenses resulting from the accident totaled $88,184.00.[2] It is undisputed that Vanderbilt/BCBS paid

---

[1] All facts in this section, unless otherwise specified, are drawn from the Pesaks' Response to Statement of Material Facts as to Which Vanderbilt University Contends There is No Genuine Issue for Trial (Doc. No. 61) and Vanderbilt's Response to Defendants/Counter-Plaintiffs' Statement of Undisputed Facts (Doc. No. 59).

[2] Although the Pesaks neither admit nor deny the total amount of expenses Vanderbilt claims in their responsive filing regarding Vanderbilt's factual assertions, they do admit in their Answer that Mrs. Pesak was billed for approximately $89,425.00 for services pertaining to her treatment (Doc. No. 44 ¶7)—an amount not far different from what Vanderbilt cites.

2

$39,235.80 for Mrs. Pesak's medical expenses. The Pesaks paid at most $2,000.00 in co-pays and deductibles in relation to her medical costs, but they were not billed for any of the medical expenses in this matter. On February 12, 2007, Mrs. Pesak and her husband filed a lawsuit in state court against the driver of the other vehicle. The case resulted in a settlement.[3]

On November 25, 2008, Vanderbilt (as Plan fiduciary, sponsor, and administrator) filed this action against the Pesaks and Larry Ashworth,[4] the Pesaks' attorney in the state court litigation, pursuant to 29 U.S.C. § 1132(a)(3), seeking restitution in the form of a constructive trust or an equitable lien on the sums it paid for Mrs. Pesak's medical expenses in connection with the car accident. Vanderbilt premises its restitution claim on the Subrogation and Right of Recovery provision in the Vanderbilt University Health Benefit Plan Evidence of Coverage ("Evidence of Coverage"). The relevant language of the provisions is as follows:

> **Subrogation Rights**
> The Plan assumes and is subrogated to Your legal rights to recover any payments the Plan makes for Covered Services, when Your illness or injury resulted from the action or fault of a third party. The Plan's subrogation rights include the right to recover the reasonable value of prepaid services rendered by Network Providers.
>
> The Plan has the right to recover any and all amounts equal to the Plan's payments from:

---

[3] Vanderbilt alleges in its Complaint that David B. Scott, Mr. Ashworth's opposing counsel in the state court litigation, informed Vanderbilt's attorney that the settlement figure was $410,000. (Doc. No. 1 ¶ 15.) Mrs. Pesak declined to confirm the figure in her deposition, which is docketed at No. 55, citing a protective order that shielded the settlement amount. (Kathy Pesak Depo. 41 ¶¶ 18-20, 49 ¶ 24.)

[4] Vanderbilt alleges in its Complaint that Mr. Scott informed Vanderbilt's attorney that he sent the settlement funds to Mr. Ashworth on November 10, 2008. (Doc. No. 1 ¶ 15.) The Pesaks neither admitted nor denied this allegation in their Answer to the Complaint and claimed that the statement should be stricken pursuant to Federal Rule of Evidence 408. (Doc. No. 44 ¶ 15.) The Court declines to take the latter action, as Rule 408—which pertains to matters such as impermissible proof of liability on a disputed claim or improper impeachment on the basis of settlement or offers to settle—has nothing to do with reference to a settlement in this case. Vanderbilt is not seeking to improperly establish the Pesaks' liability in this action by pointing to their settlement of a claim; rather, the settlement in question was with a third party regarding Mrs. Pesak's car accident, and the resulting payment of funds to the Pesaks is offered to establish that they were compensated by that third party for some or all of their expenses. Liability in the car accident is not an issue in this case, so the fact of settlement in that matter does not fall within the scope of what Rule 408 forbids and thus constitutes a "permitted use" under the Rule.

3

- the insurance of the injured party;
- the person, company (or combination thereof) that caused the illness or injury, or their insurance company; or
- any other source, including uninsured motorist coverage, medical payment coverage, or similar medical reimbursement policies.

This right of recovery under this provision will apply whether recovery was obtained by suit, settlement, mediation, arbitration, or otherwise. The Plan's recovery will not be reduced by Your negligence, nor by attorney fees and costs You incur.

**Priority Right of Reimbursement**
Separate and apart from the Plan's right of subrogation, the Plan shall have first lien and right of reimbursement. This priority right of reimbursement supersedes Your right to be made whole from any recovery, whether full or partial. You agree to reimburse the Plan 100% first for any and all benefits provided through the Plan, and for any costs of recovering such amounts from those third parties from any all and all amount recovered through:

- Any settlement, mediation, arbitration, judgment, suit, or otherwise, or settlement from Your own insurance and/or from the third party (or their insurance);
- Any auto or recreational vehicle insurance coverage or benefits including, but not limited to, uninsured motorist coverage;
- Business and homeowner medical liability insurance coverage or payments.

(Doc. No. 54-3 at 5.) Vanderbilt has submitted an affidavit by Jane Bruce, a Certified Employee

Benefit Specialist and Director of Benefits Administration at Vanderbilt, indicating that the

Evidence of Coverage was kept at the Vanderbilt insurance benefits office and was freely

available to Vanderbilt employees throughout 2005 and 2006. (Doc. No. 54 ¶¶ 2, 8). The

Pesaks do not dispute this fact, but maintain that Mrs. Pesak was never provided or told about the

Evidence of Coverage, and, further, that she never signed or agreed to its provisions. (Doc. No.

61 ¶ 4.)

On December 8, 2008, four days after the Pesaks and Mr. Ashworth were served with the

Complaint in the instant case, they filed a pleading in state court titled "Plaintiffs' Motion and

Memorandum of Law in Support Thereto Requesting the Court to Determine." The pleading

4

asked the state court to determine the respective entitlements of Vanderbilt and the Pesaks to the sums paid by Vanderbilt/BCBS for Mrs. Pesak's medical expenses. On December 11, 2008, BCBS, on Vanderbilt's behalf, removed that case to this Court, which then remanded it back to state court on January 27, 2010.

The Pesaks moved to dismiss Vanderbilt's current restitution claim on December 24, 2008. (Doc. No. 8.) On January 8, 2010, Vanderbilt filed a motion for summary judgment. (Doc. No. 25.) The Pesaks filed motions to strike Vanderbilt's motion for summary judgment and for a protective order on January 14, 2010. (Doc. Nos. 33 & 34.) These motions were all referred to Magistrate Judge Brown. (Doc. No. 37.) The Magistrate Judge recommended that the Pesaks' motion to dismiss be denied, Vanderbilt's motion for summary judgment be stricken, the Pesaks' motion to strike be granted, and Vanderbilt's motion for a protective order be terminated as moot. (Doc. No. 40 at 1.) This Court adopted the Magistrate Judge's Report and Recommendation ("Report") in full on April 6, 2010. (Doc. No. 43.)

On April 19, 2010, the Pesaks filed an Answer to Vanderbilt's Complaint and also counterclaimed for abuse of process, intentional infliction of emotional distress, fraud, and unjust enrichment under the common law, as well as violations of the Tennessee Consumer Protection Act. (Doc. No. 44.) Vanderbilt filed an Answer on May 27, 2010. (Doc. No. 48.) On October 6, 2010, the Pesaks filed a Motion for Summary Judgment on Vanderbilt's claim (Doc. No. 51), and on October 12, 2010, Vanderbilt filed a Motion for Summary Judgment on its claim as well as the Pesaks' counterclaims (Doc. No. 52). On October 27, 2010, Vanderbilt filed a Response to the Pesaks' Motion. (Doc. No. 58.) The Pesaks filed a Response to Vanderbilt's Motion on November 2, 2010. (Doc. No. 60.) Vanderbilt also submitted a Reply to the Pesaks' Response

to Vanderbilt's Motion on November 16, 2010. (Doc. No. 62.) The Court then held a hearing

on the pending motions on February 4, 2011, at which the parties presented oral argument.

## II.   LEGAL STANDARD

Rule 56(a) of the Federal Rules of Civil Procedure provides in part that "the court shall

grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to a judgment as a matter of law." The general thrust of the

inquiry a court must perform in considering a motion for summary judgment is whether there is a

need for trial, in that genuinely disputed factual matters must be put to the fact-finder because

they might reasonably be resolved in either party's favor. *Anderson v. Liberty Lobby, Inc.*, 47

U.S. 242, 250 (1986). "The mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no *genuine* issue of *material* fact." *Id.* at 247-48. The substantive law involved

in the case will underscore which facts are material, and only disputes over outcome-

determinative facts will bar a grant of summary judgment. *Id.* at 248.

Parties must support their allegations as to the existence or absence of a genuine dispute

as to any material fact: Rule 56(c)(1)(A) allows parties to support their claims by citing to

materials in the record; Rule 56(c)(1)(B) allows them to support their claims by showing that

"the materials cited do not establish the absence or presence of a genuine dispute, or that an

adverse party cannot produce admissible evidence to support that fact." While the moving party

bears the initial burden of proof for its motion, the party that opposes the motion has the burden

to come forth with sufficient proof to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317,

323-24 (1986).

6

In ruling on a motion for summary judgment, the court must review the facts and reasonable inferences to be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Further, the Court will closely scrutinize the movant's papers while indulgently treating those of the opponent. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962) (citations omitted).

## III. ANALYSIS

### A. Vanderbilt's claim

There is disagreement between the parties regarding the proper legal basis for Vanderbilt's claim against the Pesaks. Vanderbilt maintains that this is an action seeking equitable relief pursuant to § 502(a)(3) of ERISA, 29 U.S.C. § 1132(a)(3), while the Pesaks insist on characterizing Vanderbilt's claim as a breach-of-contract action governed by Tennessee contract law rather than ERISA statutory and regulatory provisions. The Court will address this issue first before proceeding to the issue of judgment on Vanderbilt's claim.

#### 1. Vanderbilt's Claim Arises Under ERISA

The Pesaks rely in their Motion on the following language in the Magistrate Judge's Report, which this Court adopted in full, to support their argument that Vanderbilt's claim is a breach-of-contract claim brought under state law: "Plaintiffs' alleged claims are clearly predicated on the terms of the health plan contract, not ERISA statutory penalties. Plaintiffs are seeking reimbursement of the costs expended based on the contract terms, not on any statutory right." (Doc. No. 40 at 4.) In their Response to Vanderbilt's Motion, the Pesaks also cite the Court's Order adopting the Report, which stated: "Plaintiff has yet to produce the contract upon which its claim is based. The Court would find it extremely difficult to grant a motion for

7

summary judgment without first being able to view the contract in its entirety." (Doc. No. 43 at 9.)

The Pesaks' argument is misplaced; the fact that there is an underlying health insurance contract within the context of an ERISA plan does not change the nature of Vanderbilt's action. This is, as Vanderbilt has consistently asserted, an action under § 502(a)(3) of ERISA. Section 502(a)(3) authorizes a plan fiduciary to bring suit to "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). The forms of equitable relief available under § 502(a)(3) are limited to "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution)." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993). The Supreme Court has made it clear that "not all relief falling under the rubric of restitution [was] available in equity." *Great-West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 212 (2002). Historically, the *Knudson* Court explained, restitution could be an equitable or legal remedy, and whether the remedy was equitable or legal depended on the basis for the claim and the relief sought. *Id.* at 213. Restitution was an equitable remedy when the plaintiff sought relief in the form of a constructive trust or an equitable lien upon "particular funds or property in the defendant's possession." *Id.* But when the plaintiff merely sought to impose personal liability upon the defendant to pay a sum of money—not to restore particular funds or property in the defendant's possession—the plaintiff assumed the status of a general creditor, and the restitutionary remedy he or she sought was legal rather than equitable. *Id.* at 213-14.

8

In *Sereboff v. Mid Atlantic Medical Services, Inc.*, the Supreme Court considered the scope of equitable relief available under § 502(a)(3) to an ERISA plan fiduciary seeking to enforce a reimbursement provision against a plan beneficiary. 547 U.S. 356 (2006). As in this case, the beneficiaries in *Sereboff* were injured in a car accident and their insurance plan covered their medical expenses. *Id.* at 360. The beneficiaries then brought a tort claim against several third parties responsible for the accident and eventually obtained a settlement. *Id.* The plan fiduciary filed suit in district court to enforce the plan's third-party reimbursement provision providing for repayment of plan benefits out of any third-party recovery. *Id.* The beneficiaries agreed to set aside from their settlement a sum equal to the amount the plan claimed, and to preserve this sum in an investment account pending the outcome of the suit. *Id.* at 356.

Rejecting the beneficiaries' argument that the relief the plan fiduciary sought was not equitable, the Court in *Sereboff* noted that the plan's terms "specifically identified a particular fund, distinct from the [beneficiaries'] general assets—'[a]ll recoveries from a third party (whether by lawsuit, settlement, or otherwise)'—and a particular share of that fund to which [the plan] was entitled–'that portion of the total recovery which is due [the plan] for benefits paid.'" *Id.* at 364. The funds, set aside in the beneficiaries' investment accounts, were within their possession and control. *Id.* at 363. Accordingly, the Court held that the restitutionary relief sought by the plan fiduciary qualified as "appropriate equitable relief" under § 502(a)(3). *Id.* at 364.

The *Sereboff* Court noted that the mere fact that the plan fiduciary alleged a breach of contract did not preclude it from maintaining a valid § 502(a)(3) claim. "ERISA provides for equitable remedies to *enforce plan terms*, so the fact that the action involves a breach of contract can hardly be enough to prove relief is not equitable; that would make § 502(a)(3)(B)(ii) an

9

empty promise." *Id.* at 363. Ultimately, *Sereboff* stands for the proposition that an ERISA plan fiduciary pursues "appropriate equitable relief" within the meaning of § 502(a)(3) when it seeks enforcement of the plan's reimbursement provision that identifies a particular fund and the share of that fund to which the plan is entitled, and that fund or a portion of it is within the possession and control of the beneficiary.

Further, the Sixth Circuit has applied the rule of *Sereboff* in a case still more factually similar to the one at bar. In *Longaberger Co. v. Kolt*, the Circuit Court held that a plan fiduciary may seek to impose a constructive trust or equitable lien on the settlement funds in the possession and legal control of the beneficiary's attorney in order to recover its assets pursuant to § 502(a)(3). 586 F.3d 459, 468-69 (6th Cir. 2009). *Longaberger* presented a scenario like that in *Sereboff*, with the exception that the settlement proceeds obtained by the beneficiary in his tort action were deposited in his attorney's account for disbursement. *Id.* at 462. The plan fiduciary named the attorney as a defendant in its suit. *Id.* Observing that § 502(a)(3) contains no limitation on the universe of potential defendants, the court found "no statutory barrier that prevent[ed] [the attorney] from being a defendant in a suit brought pursuant to § 502(a)(3) of ERISA, provided that the relief sought lies in equity." *Id.* at 468.

The Court now turns to the matter before it. Vanderbilt's Complaint itself asserts that its restitution claim is brought pursuant to § 502(a)(3) (Doc. No. 1-1 at 1), and it is reasonably clear that Vanderbilt has in fact asserted a § 502(a)(3) cause of action. Vanderbilt seeks to enforce the Subrogation and Right of Recovery provision found in the Evidence of Coverage through the use of a constructive trust or an equitable lien. (Doc. No. 1 ¶ 17.) Per the Supreme Court's instruction in *Knudson*, this Court must consider whether Vanderbilt seeks to restore "particular funds or property in the defendant's possession." 534 U.S. at 213. Like the reimbursement

10

provision at issue in *Sereboff*, the Subrogation and Right of Recovery provision specifies a fund distinct from the Pesaks' general assets: "any and all amounts recovered through any settlement, mediation, arbitration, judgment, suit, or otherwise, or settlement from [y]our own insurance and/or from the third party (or their insurance)." (Doc. No. 11-1 at 5.) The provision identifies a particular share of that fund to which Vanderbilt is entitled: "100% . . . for any and all benefits provided through the Plan, and for any costs of recovering such amounts from . . . third parties." (*Id.*) Like the complaint in *Longaberger*, Vanderbilt's Complaint alleges that the disputed funds are in the possession and control of the Pesaks' attorney, and names the attorney, Mr. Ashworth, as a defendant. (Doc. No. 1 ¶ 23.) Vanderbilt is therefore pursuing a form of "appropriate equitable relief" contemplated by § 502(a)(3) of ERISA.

The Pesaks do not dispute this analysis, but they apparently interpret language in the Magistrate Judge's Report and this Court's previous Order as manifesting a contrary conclusion. According to the Pesaks, the Magistrate Judge's observation that Vanderbilt "seek[s] reimbursement of the costs expended based on the contract terms, not on any statutory right" is equivalent to a finding that Vanderbilt's claim is purely a breach-of-contract claim. (Doc. No. 60 at 1-2.) The Pesaks are mistaken. Section 502(a)(3) expressly authorizes a plan fiduciary to bring suit to enforce plan terms, so the fact that Vanderbilt alleges a violation of a plan provision obviously cannot preclude them from maintaining a valid § 502(a)(3) claim. As long as Vanderbilt requests "appropriate equitable relief," § 502(a)(3) is a available as a means of enforcing the Pesaks' contractual obligations. This is fully consistent with the language in the Report relied on by the Pesaks. The language, particularly the "statutory right" referred to by the Magistrate Judge, speaks to the entirely different issue of the applicable statute of limitations.

11

ERISA does not contain a statute of limitations for a claim brought under § 502(a)(3). In cases under ERISA in which there is an "absence of a federally mandated statute of limitations, the court should apply the most analogous state law statute of limitations." *Redmon v. Sud-Chemie Inc. Ret. Plan for Union Emps.*, 547 F.3d 531, 534 (6th Cir. 2008) (quoting *Meade v. Pension Appeals & Review Comm.*, 966 F.2d 190, 194-95 (6th Cir. 1992)). While the Sixth Circuit has yet to squarely address the issue, most courts that have had to determine the statute of limitations governing § 502(a)(3) reimbursement claims brought by plan fiduciaries apply the forum state's statute of limitations governing contract actions generally. *See, e.g.*, *Blue Cross & Blue Shield of Ala. v. Sanders*, 138 F. 3d 1347, 1357 (11th Cir. 1998); *The W. & S. Life Ins. Co. v. Wall*, 903 F. Supp. 1155, 1161 (E.D. Mich. 1995). This situation is to be contrasted with claims brought by plan participants or beneficiaries seeking relief for violations of specific ERISA requirements, which the Sixth Circuit has found to be governed by the forum state's statute of limitations for statutory penalties. *Redmon*, 547 F.3d at 535 (applying Kentucky's limitations period for statutory penalties); *see also Elliott v. Council Health Plan*, No. 3:09-cv-00661 (M.D. Tenn. Jan. 14, 2009) (recommendation of magistrate judge that motion to dismiss in an ERISA civil enforcement action should be granted due to Tennessee's one-year statute of limitations for statutory penalties, a finding later adopted by district judge).

Thus, the Magistrate Judge's observation that Vanderbilt "seek[s] reimbursement of the costs expended based on the contract terms, not on any statutory right" merely recognizes the fact that Vanderbilt seeks enforcement of a term contained in the Plan that Vanderbilt claims the Pesaks were bound by. The language has no bearing on whether Vanderbilt has stated a cause of action for equitable relief under ERISA or state contract law, and instead speaks to a distinct

12

issue—that is, whether "the most analogous state law statute of limitations" is Tennessee's six-year limitations period or the state's one-year statute of limitations for statutory liability.

In light of the analysis above, the Court finds that this is an action under ERISA, not a contract claim under the law of Tennessee. The law of ERISA and federal common law interpreting it, not state common law theories, must be applied to Vanderbilt's claim. *See Health Cost Controls v. Isbell*, 139 F.3d 1070, 1072 (6th Cir. 1997) (courts must apply plain language of ERISA plans and may use federal common law to assist in interpretation, but may not use general common law theories to alter plan terms).[5]

### 2. The Record Reflects a Genuine Dispute as to Whether Vanderbilt May Recover the Funds in Question

Vanderbilt asserts that the Subrogation and Right of Recovery provision found in the Evidence of Coverage "unambiguously establishes [Vanderbilt's] claim to all the disputed funds." (Doc. No. 57 at 13-14.) In the briefs currently before the Court, the Pesaks do not dispute Vanderbilt's assertion that the terms of the provision would entitle Vanderbilt to the disputed funds if the terms were binding. Rather, the parties disagree as to whether the language of the Subrogation and Right of Recovery provision *is* in fact binding on the Pesaks.

Plaintiff argues that the Pesaks have admitted that they were a part of the Vanderbilt Plan, that the Affidavit of Jane Bruce highlights the relevant provisions of that Plan regarding subrogation and reimbursement, that those terms are binding on the Pesaks, and that there is no evidence to the contrary. Plaintiff cites very little law in support of its position that it is entitled

---

[5] This conclusion is important not only to the resolution of the motions presently considered, but also to the retention of jurisdiction over this action: despite Defendants' unrelenting assertions that this action arises solely in state contract law, they apparently failed to recognize that if this were the case, the basis on which Vanderbilt brought the action in federal court would be eliminated, leaving only state-law claims. Nor, apparently, did they contemplate any potential federal preemption issues that might arise from such a claim in light of ERISA's broad preemption clause, 29 U.S.C. § 1144. One would imagine that if Defendants took their own argument about the nature of this suit seriously, they would have raised these matters with the Court.

13

to summary judgment on the facts before the Court, and no law relevant to a situation such as this, where the defendants deny the enforceability of the Evidence of Coverage in its entirety. However, it highlights the Bruce Affidavit as well as the first line in the Pesaks' brief supporting their Motion for Summary Judgment, which states, "On February 13, 2006, Kathy Pesak was an employee of Vanderbilt University Medical Center and was insured as part of a health benefit plan offered by her employer." This purportedly shows that the Pesaks admit they were part of the Vanderbilt Plan. (Doc. No. 58 at 3.) Plaintiff also cites equitable factors in favor of judgment on its behalf, including that during Mrs. Pesak's many years receiving health insurance from Vanderbilt, Vanderbilt provided her assistance and information regarding her insurance, her medical bills were paid in exchange for her monthly contribution ($77.50 per pay period at the time of her accident), and Vanderbilt paid all of her medical expenses in relation to the accident. (*Id.* at 4-5.)

The Pesaks, proceeding under the erroneous assumption that Vanderbilt's ERISA suit is actually a breach-of-contract action brought under state law, present sparse legal arguments based in Tenneseee law that are mostly irrelevant to the resolution of the case. The main thrust of the Pesaks' briefs is that under Tennessee law, Vanderbilt cannot recover the disputed funds without first producing a "fully executed contract"—a document that incorporates the Subrogation and Right of Recovery provision and is signed by both parties. (Doc. No. 51-1 at 3-5.) The Pesaks admit that they paid Vanderbilt for medical insurance, that they believe their insurance was through BCBS, and that the coverage was provided as expected. As to the Subrogation and Right of Recovery provisions, however, Defendants aver the Mrs. Pesak never received the Evidence of Coverage, that it was never explained to her, and that she "never signed or agreed to the provisions of the document." (Doc. No. 61 ¶¶ 3-5.)

14

As this is not a breach-of-contract action under Tennessee law, but instead an action for

an equitable lien or restitution under ERISA, the Pesaks' defense is not directly applicable. As

described below, ERISA contains specific provisions regarding the means by which Plan

information must be made available to participants and beneficiaries. The Evidence of Coverage

is part of the Summary Plan Description document ("SPD").[6] As the administrator of the Plan,

Vanderbilt is legally obligated to provide employees covered under the Plan with a copy of the

SPD. *See* 29 U.S.C. § 1022(a) ("A summary plan description . . . shall be furnished to

participants and beneficiaries as provided in § 1024(b) of this title."). Statements in a summary

plan description are binding, and if such statements are in conflict with those in the plan itself,

the SPD will govern. *Edwards v. State Farm Mut. Auto. Ins. Co.*, 851 F.2d 134, 136 (6th Cir.

1988). However, ERISA's statutory and regulatory provisions nowhere require that an SPD be

signed by a participants or beneficiary in order to be binding.

Despite the inapplicability of the Tennessee law the Pesaks cite, their position is not

entirely without merit. In their Response and Memorandum in Opposition to Plaintiffs' Motion

for Summary Judgment, they note that:

> When Ms. Pesak[7] was asked [during her deposition] if she had seen the [Evidence
> of Coverage], Ms. Pesak stated[,] "I have never seen this." Ms. Pesak explained
> that the Evidence of Coverage would not have been and indeed was not offered to
> the employees.

(Doc. No. 60 at 3) (internal citations omitted). Indeed, Plaintiffs accurately describe Mrs.

Pesak's deposition testimony. As will be discussed below, the underlying issues raised by Mrs.

---

[6] The Evidence of Coverage states that "together with the Vanderbilt Health Care Summary Plan Description [it] forms the complete Summary Plan Description document for the Vanderbilt Network Option." (Doc. No. 54-3 at 1.)

[7] Kathy Pesak has consistently been referred to as "Mrs. Pesak," not "Ms. Pesak," in the Pesaks' filings through this point in the litigation, so, in the absence of information indicating that she in fact goes by "Ms. Pesak," the Court will continue to refer to her as "Mrs. Pesak" in the interest of consistency.

15

Pesak's testimony and the general thrust of the Pesaks' legal arguments may create a barrier to Vanderbilt's attempt to recover from the Pesaks, and prevent the Court from granting judgment to either party at this time.

The questions that arise are twofold. First, there is a basic question of whether the Evidence of Coverage that contains the subrogation and reimbursement provisions does in fact apply to the insurance option Mrs. Pesak elected for 2006. Second, even if it can be said with certainty that this document applies to the coverage Mrs. Pesak selected, there is an issue of whether Vanderbilt made the contents of the Evidence of Coverage adequately available to Plan participants—or if it was even made available at all. Both of these matters go to the issue this Court has previously raised regarding the legitimacy or existence of an underlying agreement between Kathy Pesak and Vanderbilt.

Regarding the applicability of this particular Evidence of Coverage to Mrs. Pesak's insurance selection, the Court looks first at Vanderbilt's submissions to the Court. Vanderbilt has supplied Jane Bruce's Affidavit regarding the Evidence of Coverage and Mrs. Pesak's election of benefits. (Doc. No. 54 ¶ 2.) In her Affidavit, she states that the Evidence of Coverage supplied to the Court (Doc. No. 54-3) was in place in 2006, "is expressly incorporated by the Plan at Vanderbilt," and was kept at the Vanderbilt insurance benefits office for employees to review throughout late 2005 and 2006. (Doc. No. 54 ¶ 8.) With the Affidavit, she also included a "representative packet of materials mailed to Kathy Pesak" (*id.* ¶ 4), which, upon the Court's review, appears to be a 12-page document providing brief summaries and facts about Vanderbilt's health plan options and information about how to enroll (Doc. No. 54-1). She also attaches an open enrollment form signed by Kathy Pesak (Doc. No. 54-2) that allegedly "evidenc[es] both the receipt of [the representative packet] by Ms. Pesak and of her election

16

concerning her benefit options for the year 2006." (Doc. No. 54 ¶ 5.) That election was the BluePreferred plan at a rate of $77.50 per pay period, evidenced by a marking of "NC" or "No Change," as well as an election of CIGNA Dental PPO dental care. (Doc. No. 54 ¶ 6.)

Vanderbilt cites no law supporting their argument that the evidence above is sufficient to establish that the Pesaks are bound by the terms of the Evidence of Coverage. Vanderbilt has not submitted a copy of the Plan itself, despite reference to it in the Bruce Affidavit and in the Evidence of Coverage itself. There is no explicit reference to the Plan or to the Evidence of Coverage in the enrollment form Mrs. Pesak signed, nor, despite Ms. Bruce's averment, does it indicate anywhere that Mrs. Pesak received the representative packet of materials, nor did Mrs. Pesak agree that she had received it in her deposition. Perhaps this form was included in the packet, as the packet language suggests (Doc. No. 54-1 at 1), but presumably this form was not only available in the packet mailed to employees. While the representative packet of enrollment materials describes generally the coverage provided under different plans available to Vanderbilt employees, it does not go into a level of detail that includes issues such as subrogation and reimbursement, and it makes no reference to the Evidence of Coverage or other Plan documents. Although Vanderbilt has established a link between the Evidence of Coverage and the Plan itself, there is nothing beyond Ms. Bruce's claims to connect these documents with Mrs. Pesak's enrollment form or the materials she received describing her health care options. This—in conjunction with Mrs. Pesak's testimony that she had never seen a copy of the Evidence of Coverage, did not know what it was, and did not believe it was provided to employees—prevents the Court from finding that there is no genuine dispute of material fact as to whether the terms of the Evidence of Coverage are binding on Mrs. Pesak.

17

As to the second issue raised above, an ERISA plan administrator must disclose certain materials, including an SPD, to plan participants and beneficiaries. The disclosure and mandatory contents of the SPD are governed by various statutory and regulatory provisions. At stated times the administrator must furnish to all plan participants and beneficiaries receiving benefits under the plan: a copy of the SPD; a summary description of any material modifications in the terms of the plan and any changes in certain information; and an updated copy of the SPD. 29 U.S.C. §§ 1022(a), 1024(b)(1). The administrator must make the latest updated SPD available to participants and beneficiaries for inspection at reasonable times and places. *Id.* § 1024(b)(2). The latest updated SPD must be furnished by the plan administrator upon written request of a participant or beneficiary. 29 U.S.C. § 1024(b)(4).

Further, the administrator must furnish the materials in a manner "reasonably calculated to ensure actual receipt of the material by plan participants [and] beneficiaries." 29 C.F.R. § 2520-104b-1(b)(1). Courts are in general agreement that proof of "actual receipt" is not required as long as the administrator selects a method "reasonably calculated" to reach participants. *See Custer v. Murphy Oil U.S.A., Inc.,* 503 F.3d 415, 418-19 (5th Cir. 2007); *Crotty v. Dakotacare Admin. Servs., Inc.,* 455 F.3d 828, 830 (8th Cir. 2006); *Lettrich v. J.C. Penney Co., Inc.,* 213 F.3d 765, 770 (3d Cir. 2000); *Leyda v. AlliedSignal, Inc.*, 322 F.3d 199, 208 (2d Cir. 2003). A method reasonably calculated to result in actual receipt meets the statutory standard "provided that there is assurance that procedures for distribution actually were followed and that they were effective." *Hirt v. Equitable Ret. Plan*, 441 F. Supp. 2d 516, 542 (S.D.N.Y. 2006).

Although the Pesaks have not invoked these provisions to give force to Mrs. Pesak's assertion that the Evidence of Coverage was not available to her, there is some related case law

18

in this Circuit that suggests her concerns might prevent Vanderbilt from enforcing the subrogation provision against her. In *Electro-Mechanical Corp. v. Ogan*, 9 F.3d 445 (6th Cir. 1993), the Sixth Circuit contemplated an issue similar to the one presently before the Court. There, a plaintiff-employer also sought to enforce a subrogation provision of a health insurance plan against an employee, Mr. Ogan, and his wife, who had received a settlement in a medical malpractice action on behalf of their son. *Id.* at 446-48. The Ogans argued in part that the employer should not be allowed to enforce the subrogation provision against them "because it breached its fiduciary duty to explain to them the meaning and significance of the subrogation provision." *Id.* at 451. They cited not only ERISA's general provisions imposing fiduciary duties upon the plan administrator, 29 U.S.C. § 1104(a)(1)(A-B), but also § 1022(a)(1)'s requirements that the plan administrator furnish participants with copies of the plan written in a comprehensible fashion. *Id.* Although the Ogans did not contest that Mr. Ogan had received a copy of the plan and a relevant amendment (he was the supervisor charged with distributing the booklets), they argued that the addition of the subrogation provision in the amendment without a definition of it was a violation of plaintiff's fiduciary duties, such that the term could not be enforced. *Id.* The court agreed that ERISA imposed fiduciary duties on Mr. Ogan's employer regarding the distribution and language of the SPD, but ultimately found that the employer met its obligations by making the SPD available—it was Mr. Ogan's duty to inquire further if he was confused about the term "subrogation." Thus, while the court granted summary judgment to the employer, its analysis suggests that failure to comply with § 1022(a)(1)'s requirements—such as the failure to make an SPD available—can prevent the enforcement of a subrogation clause.

As stated above, the Bruce Affidavit avers that the Evidence of Coverage provided to the Court was in place during 2006 and was available for employees to review at Vanderbilt's

19

insurance benefits office. Mrs. Pesak, on the other hand, has testified that this document was not available to employees. To the extent that the Pesaks maintain that Mrs. Pesak was never provided with a copy of the Evidence of Coverage or otherwise made aware of it, however, there remains a genuine dispute as to whether Vanderbilt complied with ERISA § 1022(a). Mrs. Pesak's undisputed statement that she did not receive a copy of the document does not entitle the Pesaks to summary judgment, but it does raise a genuine issue of fact as to whether the Evidence of Coverage was adequately made available to Plan participants.

Neither Plaintiff nor the Defendants in this case have put forth an adequate basis in fact—or any basis in law, given both parties' extremely limited citation to relevant precedent—that entitles them to judgment. Accordingly, this Court denies both parties' Motions for Summary Judgment as to the ERISA claim.

## B. The Pesaks' counterclaims

### 1. Abuse of Process

In Count I of the Counter-Complaint, the Pesaks claim that the attempted removal of their previous state court action to federal court was an abuse of process. The Counter-Complaint asserts that Vanderbilt sought to compel the Pesaks to "pay moneys to [Vanderbilt] through illegal process." (Doc. No. 44 ¶ 47.) The Pesaks further assert in their Response to Vanderbilt's Motion that "[Vanderbilt] removed the state case to federal court for the sole purpose of preventing the state trial court from ruling on the Pesaks' motion to determine if Kathy Pesak had been made whole." (Doc. No. 60 at 5.) However the Pesaks choose to characterize Vanderbilt's motives, they have failed to allege facts sufficient to sustain a cause of action for abuse of process.

20

A plaintiff must establish two elements to recover for abuse of process: (1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of the charge. *Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 555 (Tenn. 1999). "Process" is defined as "that which emanates from or rests upon court authority and which constitutes a direction or demand that the person to whom it is addressed perform or refrain from doing some prescribed act." *Bell v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, No. 03A01-9707-CV-00292, 1998 WL 24414, at *2 (Tenn. Ct. App. Jan. 20, 1998) (internal citation and quotations omitted). Abuse of process "refer[s] to the use of a writ, order, or command of the [c]ourt in the course of a judicial proceeding." *Merritt-Chapman & Scott Corp. v. Elgin Coal, Inc.,* 358 F. Supp. 17, 21 (E.D. Tenn. 1972). Not every form of legal process, i.e., the filing of a motion or document with the court, is automatically considered "process" for the purpose of stating a claim for abuse of process. *Rentea v. Rose*, No. M2006-02076-COA-R3-CV, 2008 WL 1850911, at *4 (Tenn. Ct. App. Apr. 25, 2008). "Within the context of a tortious abuse of process, process refers to times when the authority of the court is used." *Id.*

In *Rentea*, the plaintiff premised an abuse of process claim on the defendant's allegedly inappropriate motion to postpone a hearing in violation of the local court rules. *Id.* Because the lower court did not entertain the motion, the Tennessee Court of Appeals explained that "the authority of the court was not employed for any purpose." *Id.* Agreeing with the trial court that the complaint had failed to allege a sufficient use of process and therefore failed to state a claim for abuse of process, the Court of Appeals affirmed the trial court's grant of summary judgment. *Id.*

21

In *Law v. Law*, the plaintiff based his claim for abuse of process on the defendant's filing of a petition for contempt against the plaintiff in state court and on three motions filed by the defendant in the contempt action. No. 3:05-1041, 2007 WL 397977, at *1 (M.D. Tenn. Feb. 1 2007). With regard to the defendant's filing of the petition for contempt, the district court noted that "mere initiation of a law suit, though accompanied by a malicious ulterior motive is not abuse of process." *Id.* at *3 (citing *Bell ex rel. Snyder*, 986 S.W.2d at 555). Maliciously causing process to issue is an element of a cause of action for malicious prosecution, a related but distinct tort. *Id.* As to the three motions filed by the defendant in state court, the court pointed out that "motions do not emanate from the court or constitute a direction or demand of the [c]ourt." *Id.* The court held that insofar as the plaintiff had failed to demonstrate a sufficient use of process, he had failed to establish the second element of a cause of action for abuse of process. *Id.*

The Pesaks' Complaint fails to state a claim for abuse of process. The basis for Vanderbilt's alleged liability for abuse of process is its "improper removal of the state court action." (Doc. No. 10 ¶ 47.) It should be noted that Vanderbilt did not file the Petition for Removal with the district court–BCBS did, on Vanderbilt's behalf. (Doc. No. 61 ¶ 67.) In any event, like the motions at issue in *Rentea* and *Law*, the Petition for Removal "[did] not emanate from the court or constitute a direction or demand of the [c]ourt." *Law*, 2007 WL 397977, at *3. Furthermore, just as the Tennessee Court of Appeals dismissed the defendant's improperly filed motion in *Rentea*, this Court dismissed the removal of the state court action due to BCBS's and Vanderbilt's lack of standing to remove the case. *See Rentea*, 2008 WL 1850911, at *4. To the extent that the Petition for Removal was unsuccessful in actually removing the case, the authority of this Court was not used for any purpose. *See id.* Accordingly, the Pesaks have failed to allege a use of process sufficient to sustain a cause of action for abuse of process.

22

In addition, even assuming the Pesaks had sufficiently alleged a use of process, summary judgment as to their abuse of process claim would still be appropriate as they have failed to substantiate their allegations of an ulterior motive, the first element of the cause of action, with any evidence. Finding "no evidence to support [the plaintiff's] interpretation of [the defendant's] supposed motives," the court in *Rentea* expressly noted that the defendant's filing of a motion in violation of the local court rules alone "[did] not evince an ulterior motive." *Id.* Similarly, the Pesaks appear to base their allegations of an ulterior motive solely on the claim that "[Vanderbilt] . . . illegally filed the action in the Pesak's [sic] name as Plaintiffs." (Doc. No. 60 at 5.) It is a stretch to say that the Petition for Removal was filed "illegally"—BCBS and Vanderbilt simply lacked standing to remove the case. In any case, the fact that the Petition lacked a legal basis "does not evince an ulterior motive." *See id.* The Petition arguably betrays a lack of knowledge of the removal rules, but it cannot substantiate the Pesaks' allegations of an ulterior motive.

As such, summary judgment on the Pesaks' abuse of process claim is warranted, because they have failed to allege a sufficient use of process. Even absent this defect, they have failed to create a genuine dispute as to a material fact regarding an essential element of the cause of action, the existence of an ulterior motive on Vanderbilt's part.

### 2. Intentional Infliction of Emotional Distress

In Count II, the Pesaks claim that "[Vanderbilt's] improper removal of the state court action and the concurrent filing of the instant complaint constitutes outrageous conduct done with the specific intent or reckless disregard of the probability of causing emotional distress to [the Pesaks]." (Doc. No. 44 ¶ 49.) Under Tennessee law, there are three essential elements to a cause of action for intentional infliction of emotional distress ("IIED"): (1) the conduct

23

complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997).

The Tennessee Supreme Court has stated that it is not an easy burden to meet the essential elements of IIED. *Id.* The court has adopted "[a] high threshold standard," which is described as follows:

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

*Id.* It is the Court's duty in the first instance to apply the standard and make a preliminary determination as to "whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Id.* at 623 (internal citation and quotation omitted).

The Pesaks have failed to meet the standard for alleging outrageous conduct. In *Lane v. Becker*, defendant Becker, an attorney, deposed the plaintiff, Lane, in connection with a defamation case and subsequently named Lane as a defendant in the defamation action. 334 S.W.3d 756, 758-59 (Tenn. Ct. App. 2010). The action against the plaintiff was dismissed. *Id.* He then brought several claims against the attorney, including one for IIED. *Id.* The Tennessee Court of Appeals found that taking the deposition and filing the lawsuit against the plaintiff did not rise to the level of "outrageous conduct" and

24

concluded that the complaint failed to state a claim for IIED as a matter of law. *Id.* at 763. Courts in other jurisdictions have also reached the conclusion that the tort of IIED may not be invoked to protect parties from the litigation process. *See, e.g., Webster v. United Auto Workers, Local 51*, 394 F.3d 436, 443 (6th Cir. 2005) (affirming the district court's holding that a defendant's filing of a defamation suit against a plaintiff did not rise to the level of outrageous conduct required for IIED under Michigan law); *Amstadter v. Liberty Healthcare Co.*, 503 S.E.2d 877, 880 (Ga. Ct. App. 1998) (neither the filing of a lawsuit nor a threat to file a lawsuit is sufficient to establish outrageous conduct); *Anderson Dev. Co. v. Tobias*, 116 P.3d 323, 338 (Utah 2005) (an allegation of improper filing of a lawsuit of the use of legal process against an individual does not state claim for IIED); *Davis v. Currier*, 704 A.2d 1207, 1209 (Me. 1997) ("We are not prepared to recognize that the tort of [IIED] is available to a party outraged by the filing of a lawsuit against it.") Accordingly, the filing of the Petition for Removal does not rise to the level of "outrageous conduct" as a matter of law. The Pesaks have failed to allege facts sufficient to support a claim for IIED.

In addition, the Pesaks have not alleged a "serious mental injury." "A serious or severe emotional injury occurs where a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the case." *Camper v. Minor,* 915 S.W.2d 437, 446 (Tenn. 1996) (internal citations and quotations omitted). Embarrassment and humiliation, for example, do not amount to a "serious mental injury" required for IIED. *Barbee v. Wal-Mart Stores, Inc.*, No. W2003-00017-COA-R3-CV, 2004 WL 239763, at *3 (Tenn. Ct. App. Feb. 9, 2004). The Counter-Complaint does not allege *any* mental injury to either Mr. or Mrs. Pesak. The

25

Pesaks' Response and Memorandum in Opposition to Plaintiffs' Motion for Summary

Judgment notes only that Mrs. Pesak stated in her deposition: "This [the removal of the

state court action] does traumatize me. Make no mistake about it." (Doc. No. 60 at 6.)

Mrs. Pesak neither described any way in which this "trauma" manifested itself, nor

alleged that she could not adequately cope with it. The bare allegation that Mrs. Pesak is

"traumatize[d]" falls short of demonstrating a mental injury that engenders mental stress

a reasonable person would be unable to adequately cope with. *See Camper*, 915 S.W.2d

at 446.

Even assuming that the Pesaks' allegations of a mental injury were sufficient to

proceed on a claim IIED, Vanderbilt would still be entitled to summary judgment on this

claim. The plaintiff in an action for IIED must present "specific evidence showing

serious mental injury." *Chapman v. AmSouth Bank*, No. 1:04-CV-237, 2005 WL

2300373, at *11 (E.D. Tenn. Sept. 21, 2005) (granting summary judgment where plaintiff

failed to present any such evidence); *see also Doe ex rel. Doe v. Memphis City Schools*,

No. 04-2283 MA V, 2005 WL 2113811, at *3 (W.D. Tenn. Aug. 26, 2005) (same).

Meeting this standard requires an IIED plaintiff to show, for instance, that he or she "has

suffered from nightmares, insomnia or depression or has sought psychiatric treatment."

*Miller v. Willbanks*, 8 S.W.3d 607, 612 (Tenn. 1999). The Pesaks vaguely allege in a

single sentence that Mrs. Pesak is "still receiving care for her injuries." (Doc. No. 60 at

6.) The nature or extent of these alleged "injuries" is unspecified. Because the Pesaks do

not point to any *specific* evidence showing serious mental injury, summary judgment on

the IIED claim is appropriate for this reason as well—a reasonable jury could not find for

them on the evidence presented.

26

In light of the foregoing, Vanderbilt is entitled to summary judgment on the Pesaks' IIED claim. The Pesaks have not alleged conduct that rises to the level of "outrageous conduct." Likewise, their claims regarding Mrs. Pesak's mental injury fall short of alleging a "serious mental injury" required to recover for IIED. Because the Pesaks' have not established a genuine dispute as to any material fact in regard to their IIED claim, this Court grants Vanderbilt's Motion on that claim.

### 3. Fraud

Count III of the Counter-Complaint alleges that Vanderbilt's actions in inducing Mrs. Pesak to sign up for medical insurance amounted to fraud and misrepresentation.[8] (Doc. No 44 ¶ 51.) In order to sustain a cause of action for fraudulent misrepresentation in Tennessee, a plaintiff must show that: (1) the defendant made a representation of an existing or past fact; (2) the representation was false when made; (3) the representation was in regard to a material fact; (4) the false representation was made either knowingly or without belief in its truth or recklessly; (5) plaintiff reasonably relied on the misrepresented material fact; (6) and plaintiff suffered damage as a result of the misrepresentation. *Homestead Grp., LLC v. Bank of Tenn.*, 307 S.W.3d 746, 751 (Tenn. Ct. App. 2009). Nondisclosure, as opposed to an affirmative representation, will give rise to a claim for fraud when the defendant has a duty to disclose and when the matters not disclosed are material. *Spectra Plastics v. Nashoba Bank*, 15 S.W.3d 832, 841 (Tenn. Ct. App. 1999).

---

[8] The Tennessee Supreme Court has noted that the terms "intentional misrepresentation," "fraudulent misrepresentation" and "fraud" are synonymous. *Concrete Spaces, Inc. v. Sender,* 2 S.W.3d 901, 904 n.1 (Tenn. 1999).

The Pesaks allege in the Counter-Complaint that the parties entered into a contract; the Pesaks paid the insurance premiums[9] pursuant to the contract; and "in reliance on the [contract] and the payment of premiums, the Pesaks [were] led to believe that the medical bills would be paid if the alleged premiums were paid." (Doc. No. 44 ¶ 51.) It is unclear whether the basis for the fraud claim is an affirmative misrepresentation made by Vanderbilt or its failure to disclose material information. The Counter-Complaint alludes to "statements" made by Vanderbilt but gives no description of what these "statements" were. (*Id.*) The Pesaks' Response and Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, on the other hand, asserts that it is Vanderbilt's failure to have a signed subrogation agreement with Mrs. Pesak— essentially, its failure to disclose to Mrs. Pesak the existence and extent of its subrogation rights—that is the basis of Vanderbilt's alleged liability for fraud. (Doc. No. 60 at 6.) Either way, the Pesaks claim that because Vanderbilt now seeks to recover the sums it paid to cover Mrs. Pesak's medical expenses stemming from the car accident, the contract they entered into was obtained fraudulently. (Doc. No. 44 ¶ 52.)

The Pesaks have failed to support a claim for fraudulent misrepresentation, as they have not so much as alleged all of the elements necessary to sustain the cause of action. A claim for fraudulent misrepresentation must be stated with particularity, meaning the plaintiff must, at a minimum, allege the time, place and content of the misrepresentations; the defendant's fraudulent intent; the fraudulent scheme; and the injury resulting from the fraud. *See* Fed. R. Civ. P. 9(b); *Coffey v. Foamex, L.P.,* 2 F.3d 157, 161-62 (6th Cir. 1993) (applying Tennessee law). Although Tennessee courts do not appear to have squarely dealt with the issue, courts generally apply the particularity analysis to claims based on nondisclosure as well. *E.g., Royal Bus. Grp., Inc. v.*

---

[9] The insurance premiums the Pesaks refer to are the payroll deductions that Vanderbilt made pursuant to the plan.

*Realist, Inc.*, 933 F.2d 1056, 1064-66 (1st Cir. 1991) (affirming dismissal of a claim where the plaintiff failed to allege facts sufficient to give rise to a legal duty to disclose); *Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd*, 85 F. Supp. 2d 282, 296 (S.D.N.Y. 2000) (requiring the plaintiff to allege facts giving rise to a duty to disclose); *625 3rd St. Assocs., L.P. v. Alliant Credit Union*, 633 F. Supp. 2d 1040, 1050 (N.D. Cal. 2009) (same).

The Pesaks have failed to meet the particularity requirement. While their Counter-Complaint refers to "statements" allegedly made by someone at Vanderbilt, it is completely devoid of any description of the time, place, and content of these alleged statements. Similarly, the Pesaks' Response and Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment does not allege that Vanderbilt had a duty to disclose the extent of its subrogation rights. The Pesaks do not describe Vanderbilt's fraudulent intent in any detail or describe its allegedly fraudulent scheme. Finally, the Counter-Complaint contains no mention of any damages allegedly caused by Vanderbilt's fraudulent acts or omissions and states only that "even if a contract exists, it is unenforceable due to fraud." (Doc. No. 44 ¶ 52.) It does conclude with a general request for damages "proven at the trial of this cause" and "for acts committed as described in [this Counter-Complaint]" (Doc. No. 44 at 13), but there does not appear to be any basis for awarding the Pesaks any damages in connection with the fraud claim. The Pesaks have yet to suffer any loss from the allegedly fraudulent conduct—Mrs. Pesak's plan covered her medical expenses, and the Pesaks have not been made to reimburse Vanderbilt.

Because the Pesaks have not alleged or supported the essential elements of a claim for fraudulent misrepresentation with sufficient particularity and have therefore failed to raise a

29

genuine issue of fact as to those elements, Vanderbilt is entitled to summary judgment on the fraud claim.[10]

### 4. Unjust Enrichment

Count IV of the Counter-Complaint alleges that "[Vanderbilt's] attempt to recover payments allegedly made under the purported contract of insurance while retaining premiums paid by the Pesaks amounts to unjust enrichment." (Doc. No. 44 ¶ 54.) Under Tennessee law, courts may impose a contract implied in law where no contract exists using the quasi-contractual theory of unjust enrichment. *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998). The elements of an unjust enrichment claim are: (1) "[a] benefit conferred upon the defendant by the plaintiff"; (2) "appreciation by the defendant of such benefit"; and (3) "acceptance of such benefit under such circumstances that it would be inequitable for him to retain the benefit without payment of the value thereof." *Paschall's, Inc. v. Dozier*, 407 S.W.2d 150, 155 (Tenn. 1966). Unjust enrichment is "a substitute for a contract and not a doctrine to be applied to contracts since unjust enrichment presupposes that one party has endowed another with a benefit without compensation." *Hayes v. Washburn*, No. M2006-01135-COA-R3-CV, 2007 WL 3202765, at *5 (Tenn. Ct. App. Oct. 31, 2007) (emphasis added).

The Pesaks allege that: (1) their payment of the insurance premiums conferred a benefit upon Vanderbilt; (2) the benefit was appreciated by Vanderbilt; and (3) it would be inequitable for Vanderbilt to retain the benefit while demanding restitution of payments for Mrs. Pesak's medical expenses. (Doc. No. 44 ¶ 54.) The facts of this case, however, cannot support a claim for unjust enrichment. The Pesaks admit that Mrs. Pesak was insured through her employment.

---

[10] The claim is also arguably pre-empted by ERISA, but because Vanderbilt did not raise the ERISA preemption affirmative defense, this Court did not address the issue.

(Doc. No. 61 ¶ 1.) They adamantly insist that Mrs. Pesak paid the insurance premiums. (*Id.* ¶ 45; Doc. No. 60 at 6.) They also admit that Mrs. Pesak's medical insurance covered her medical expenses throughout her twenty-two years as a VUMC employee. (*Id.* ¶ 9.) The Pesaks now argue that because Vanderbilt has filed litigation to recover payments made in connection with the car accident, Vanderbilt must compensate Mrs. Pesak for the "benefit" she conferred upon Vanderbilt—i.e., the insurance premiums Mrs. Pesak paid during her time at VUMC.

Even if the agreement to provide health insurance pursuant to Mrs. Pesak's election of coverage is not considered a contract (such that an action for unjust enrichment would be entirely unavailable), this is clearly not a case where "one party has endowed another with a benefit without compensation," *Hayes*, 2007 WL 3202765, at *5. The insurance premiums did not confer an uncompensated benefit upon Vanderbilt. In return for the premiums, Mrs. Pesak received medical insurance that covered her medical expenses for twenty-two years, and, indeed, paid her medical expenses in relation to her 2006 accident. In short, it is undisputed that Mrs. Pesak paid the insurance premiums, and that Vanderbilt provided her insurance in return—not that Mrs. Pesak provided Vanderbilt an uncompensated benefit. Indeed, she does not dispute that her coverage was as expected throughout her lengthy enrollment in Vanderbilt's health insurance Plan. Additionally, if Vanderbilt does succeed on its subrogation claim and recovers the funds it seeks, it would be impossible to say that the Pesaks have conferred an uncompensated benefit on Vanderbilt. Mrs. Pesak's medical bills arising from this incident totaled nearly $90,000.00, and Vanderbilt paid $39,235.80 in satisfaction of those bills; even if the Pesaks must return the latter amount to Vanderbilt, Vanderbilt has spared the Pesaks from paying the full amount of their medical debt, which is about twice the amount Vanderbilt seeks from them.

31

Further, and perhaps even more importantly, Vanderbilt has not recovered *any* money from Mrs. Pesak to date. As she admits, she has not been billed for any of her medical expenses resulting from the accident (beyond co-pays and a deductible), and Vanderbilt has not yet recovered any of the funds it seeks—the very act that the Pesaks claim to be inequitable. A claim for unjust enrichment has not ripened to date.

Ultimately, on the evidence before the Court, the Pesaks' claim for unjust enrichment is neither plausible nor ripe for consideration. Vanderbilt is entitled to summary judgment on this claim, too.

### 5. *Tennessee Consumer Protection Act*

In Count V of the Counter-Complaint, the Pesaks allege that Vanderbilt has engaged in an unfair and deceptive act within the meaning of the Tennessee Consumer Protection Act (TCPA), Tenn. Code Ann. § 47–18–101, *et seq.*, thereby causing them an ascertainable loss of money "by way of abuse of process[,] intentional infliction of emotional distress, fraud and/or as described in all other count stated [in the Counter-Complaint]." (Doc. No. 44 ¶ 56.) In order to recover under the TCPA, a plaintiff must prove: (1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an "ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated." Tenn. Code Ann. § 47–18–109(a)(1). The scope of the TCPA is broader than that of common-law fraud. *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005). Misrepresentations that would not be actionable as common-law fraud may be actionable under the TCPA. *Id.* "[A] 'deceptive act or practice' is a material representation, practice or omission likely to mislead a reasonable consumer." *Ganzevoort v. Russell,* 949 S.W.2d 293, 299 (Tenn. 1997). An act is unfair if it "causes or is

32

likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Tucker*, 180 S.W.3d at 116–17.

Tennessee courts apply the particularity requirement of the Tennessee Rule of Civil Procedure 9.02 to claims brought pursuant to the TCPA. *Scraggs v. La Petite Acad., Inc.*, No. 3:05-CV-539, 2006 WL 2711689, at *4 (E.D. Tenn. Sept. 21, 2006) (citing *Harvey v. Ford Motor Co.*, 8 S.W.3d 273, 275 (Tenn. Ct. App. 1999)). To satisfy this requirement, a complaint must set forth specific fraudulent or deceptive acts rather than general allegations. *See, e.g., Humphries v. W. End Terrace, Inc.*, 795 S.W.2d 128, 132 (Tenn. Ct. App. 1990).

The "act" complained of by the Pesaks in the Counter-Complaint is unspecified. The Pesaks' Response and Memorandum in Opposition to Plaintiff's Motion for Summary Judgment is also silent on the issue. The discussion of the TCPA claim is confined to two sentences:

> Based on the undisputed facts establishing the actions taken by [Vanderbilt], a jury could find that the actions were unfair and deceptive, amounting to a violation of the [TCPA]. A finding of fact must be determined by a jury, after considering all of the evidence, including a review of the alleged contract.

(Doc. No. 60 at 6.) The fraudulent or deceptive "actions" that purport to form the basis for Vanderbilt's TCPA liability are nowhere identified. The Pesaks' filings also fail to explain how they were misled or deceived by these "actions." Because the Pesaks' general allegations fall well short of meeting the particularity requirement applicable to TCPA claims, and establish no genuine dispute of material fact, the Court grants Vanderbilt's Motion for Summary Judgment on the Pesaks' TCPA claim.[11] *See, e.g., Parkway Assocs., LLC v. Harleysville Mut. Ins. Co.*, 129 F.

---

[11] The TCPA claim is also arguably subject to ERISA preemption, *Alexander v. Provident Life & Accident Ins. Co.*, 663 F. Supp. 2d 627, 638 (E.D. Tenn. 2009) (preempting a TCPA claim where the claim is "directly related" to the plaintiff's ERISA policy), but Vanderbilt did not raise this argument.

App'x 955, 960-61 (6th Cir. 2005) (affirming summary judgment where defendant failed to explain how it was misled or deceived by the allegedly "deceptive" practices).

## IV. CONCLUSION

For the reasons explained above, the Pesaks' Motion is **DENIED**. Vanderbilt's Motion is **GRANTED in part** as to the Pesaks' counterclaims for abuse of process, intentional infliction of emotional distress, fraud, unjust enrichment and violations of the Tennessee Consumer Protection Act, and **DENIED in part** as to Vanderbilt's restitution claim. Accordingly, the case will proceed only on Vanderbilt's restitution claim.

It is so ORDERED.

Entered this the _____ 6 _____ day of September, 2011.

JOHN T. NIXON, SENIOR JUDGE
UNITED STATES DISTRICT COURT

34